IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| DEBANY RIVERA, Individually and as Heir to the Estate of Juan Javier Martinez, Jr., Deceased; and JUAN JAVIER MARTINEZ, SR.<br>*Plaintiffs*<br><br>v.<br><br>CITY OF PASADENA; PASADENA INDEPENDENT SCHOOL DISTRICT; LONNIE SMITH, II; ZACHARY MABES; JESUS PAZ; JOSEPH LOCKMONDY; MARK HARDIN; DONNA WRIGHT; PAUL BENNETT; FEDERICO CRUZ; and TIMOTHY DEVER<br>*Defendants* | Civil Action No. 4:20-cv-01881 |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT

TO THE HONORABLE COURT:

COME NOW, Debany Rivera, in her individual capacity and as heir to the estate of Juan Javier Martinez, Jr., Deceased, and Juan Javier Martinez, Sr., plaintiffs, file this original complaint complaining of the City of Pasadena, Pasadena Independent School District, Lonnie Smith, II, Zachary Mabes, Jesus Paz, Joseph Lockmondy, Mark Hardin, Donna Wright, Paul Bennett, Federico Cruz and Timothy Dever, defendants, and would show the following:

### I. PARTIES

1. Plaintiff Debany Rivera ("Debany") is an individual residing in Harris County, Texas. She is the surviving spouse of Juan Javier Martinez, Jr.

2. Plaintiff Juan Javier Martinez, Sr., is an individual residing in Harris County, Texas. He is the surviving father of Juan Javier Martinez, Jr.

1

3.     Decedent Juan Javier Martinez, Jr. ("Javier" or "Decedent") died as a result of the injuries caused by Defendants, which are the subject of this lawsuit, on April 28, 2018. Javier died intestate, and was survived by his wife, Debany, and his father, Juan Javier Martinez, Sr. Javier had no children or descendants. Debany is Javier's sole heir at law. There has been no administration of Javier's estate, nor is one necessary. Plaintiffs bring this suit in their individual capacities as Javier's wrongful death beneficiaries, and Debany also brings this suit in her capacity as Javier's sole heir at law.

4.     Defendant City of Pasadena ("the City") is a municipality in Harris County, Texas. It has appeared and answered.

5.     Defendant Pasadena Independent School District ("PISD") is a school district in Harris County, Texas. It has appeared and answered.

6.     Defendant Lonnie Smith II ("Officer Smith") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Independent School District Police. He has appeared and answered.

7.     Defendant Zachary Mabes ("Officer Mabes") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. He has appeared and answered.

8.     Defendant Jesus Paz ("Officer Paz") is an individual residing in Harris County, Texas, and, on information and belief, is or was a sworn officer of the Pasadena Police Department. He has appeared and answered.

9.     Defendant Joseph Lockmondy ("Officer Lockmondy") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. He has appeared and answered.

10.     Defendant Mark Hardin ("Officer Hardin") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. He has appeared and answered.

11.     Defendant Donna Wright ("Officer Wright") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. She has appeared and answered.

12.     Defendant Paul Bennett ("Officer Bennett") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. He has appeared and answered.

13.     Defendant Federico Cruz ("Officer Cruz") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. He may be served with citation at his usual place of business, 1201 Davis St., Pasadena, Texas 77506, or wherever he may be found.

14.     Defendant Timothy Dever ("Officer Dever") is an individual residing in Harris County, Texas and, on information and belief, is or was a sworn officer of the Pasadena Police Department. Plaintiffs have been unable to ascertain Officer Dover's first name despite their diligent efforts. He has appeared and answered.

15.     Officers Smith, Mabes, Paz, Lockmondy, Hardin, Wright, Bennett, Cruz and Dever are collectively referred to as the "Defendant Officers."

## II.   JURISDICTION AND VENUE

16.     This action was originally filed in 127th District Court, Harris County, Texas and was removed to this Court by the City and Officers Mabes, Paz, Lockmondy, Hardin, Wright, Bennett, and Dever on the basis of federal question jurisdiction.

### III.   Facts

17.     On April 27, 2018, at or near 6:00 A.M., Javier Martinez was with Guido Capello in Strawberry Park, located at 1104 Parkside Drive, Pasadena, Harris County, Texas 77504. Javier attempted to calm Guido, who was emotionally upset, and Javier was attempting to get him to return to his house.

18.     At approximately, 6:49 am, Officer Paz of the Pasadena Police Department ("PPD") arrived near Strawberry Park and approached Mara Capello, Javier and Guido.  At this time Guido was shouting, clearly upset, and was being restrained by Javier.  Upon arrival, Officer Paz met with Mara Capello and asked her "what's going on with him?".  Mara replied "my brother, he took something.  He needs to go to the hospital."



19.     Guido approached Defendant Paz as Javier tried to calm him.  Officer Paz repeatedly spoke to Guido telling him to "calm down" and requested that Guido go to the front of his car. Javier, exhibiting no signs of intoxication, assisted in directing Guido toward the car and also attempted to calm Guido saying "calm down", "what are you doing?" and "you're being loud". Mara also told Guido "tranquilo".   Defendant Paz advised Guido that he was not under arrest, but that he was going to handcuff Guido for Paz's safety.     Javier was cooperative and attempted to keep Guido calm as Defendant Paz placed handcuffs onto Guido.  Defendant Paz then began moving Guido to the rear of his vehicle.

20.     Defendants Cruz and Mabes arrived in a second police car.   Guido again became upset and moved toward the new car, pulling forward.    Defendant Paz became excited as well and, as Javier tried to calm Guido, shouted for Javier to "get away" and "I'm not going to fucking ask you again, dude".   Defendant Cruz approached and assisted Defendant Paz in placing the handcuffed Guido over the hood of the second vehicle.   Javier attempted to approach to calm the situation, however, Defendant Paz indicated that he should not be near.  Mara spoke with Javier as well.  Javier was holding his hands out and to his side during this time and was in no manner aggressive or belligerent with any officer.  Javier moved behind Mara, approximately fifteen to twenty feet from the car.     Guido became calmer and was taken by Defendant Cruz to the rear door of his car, while Defendant Paz directed Mara to "come over here" back to his own car.  At this point, Defendant Mabes was speaking with Javier and Javier told Defendant Mabes, in response to question "because I've been chasing him around".   He then asked "is he okay?" referring to Guido.   Throughout this time, Javier was walking and displayed no signs of intoxication.

21.     As Defendant Paz was questioning Mara, Defendant Mabes requested Javier move to the front left side of the car he had driven.   Javier stood near the front fender and, at some points leaned back against it.  Javier made no threatening movements.  For the next thirty three seconds, Javier stood next to the front fender of Defendant Mabes' vehicle displaying no aggression and complying with Defendant's requests. At this stage, Mabes was already unlawfully detaining Javier, because he had no reasonable suspicion necessary to justify an investigative detention and no probable cause to justify an arrest. Mabes was wearing a body camera that was recording this exchange, but this footage appears to have conveniently been lost by the PPD.

5

22.     Then, Defendant Mabes, without any justification, reached forward and grabbed Javier's right arm and pushed him against the car.  Defendant Mabes said "listen to what I'm telling you.  Do not move away from my car…"  During this time a third vehicle arrived at the scene.  Defendant Cruz approached Javier and Defendant Mabes.  Defendant Mabes yelled "stop moving".  Here, Mabes and Cruz were unlawfully detaining and using force against Javier, because they had no reasonable suspicion necessary to justify an investigative detention, had no reason to believe Javier presented a threat to anyone, and had no probable cause to justify an arrest.



23.     From the beginning of the incident until this point, Javier had made no aggressive actions toward any officer and, further, had not violated any law or been accused of violation of any law.  Both Defendants Cruz and Mabes, without justification, forcefully turned Javier to face the hood of the car causing hard contact with the vehicle.   Defendant Paz then approached them, saying "Don't fucking play, Dude." And "Make it fucking easy, man." Defendants Mabes and Cruz then violently forced Javier to the ground on his right side.  The Defendants began stating numerous requests, including, "put your hands behind your back".  With both Defendants Mabes and Cruz placing their weight on Javier, such movement impossible as he body was on its side.  Defendant Cruz then said "roll over" as Defendant Mabes pushed Javier from the other side, again making compliance impossible. Here, Mabes, Cruz, and Paz were unlawfully detaining and using force against Javier, including attempting

to handcuff Javier, because they had no reasonable suspicion necessary to justify an investigative detention, had no reason to believe Javier presented a threat to anyone, and had no probable cause to justify an arrest.



24.     Javier said "what are you doing?" as the three Defendants pulled at Javier.   Defendant Paz said "we're not going to tell you again", followed by "Taser, Taser, Taser" as Javier was on the ground.   Mara was also present and attempted to speak to Javier.



25.     At this point, Defendant Smith, who has recently arrived, violently pushed Javier's head down onto the ground and placed his right knee on Javier**'s** neck.     Javier continued to move as the other Defendants pushed him into the ground, pulled and struck him.   Defendant Smith, during this time, threatened Javier, saying that he was going to "break your Goddamn hand," while he placed Javier in a "come-along" wrist lock in order to inflict pain on Javier. At this point three Defendants were pulling, pushing or placing bodyweight on Javier and

shouting varying instructions. Here, Mabes, Cruz, Paz, and Smith were unlawfully detaining and using force against Javier, because they had no reasonable suspicion necessary to justify an investigative detention, had no reason to believe Javier presented a threat to anyone, and had no probable cause to justify an arrest. They also had no justification for striking or using pain-inducing holds on Javier, because Javier presented no threat to anyone.

26.     Approximately one and a half minutes after Javier was initially forced to the ground, during which Defendants pulled, pushed, struck and shouted, Defendant Paz said "Fuck it, Bro. Tase him. Tase him."  Defendant Cruz said "Taser".  Defendant Cruz unholstered a Conducted Energy Weapon (CEW) and fired it into Javier, who was still on the ground, and subjected his body to up to 55,000 Volts of electricity.   Defendant Cruz then discharged the CEW into  into Javier's body several times. Here, Mabes, Cruz, Paz, and Smith were continuing to unlawfully detain and use force against Javier, because they had no reasonable suspicion necessary to justify an investigative detention, had no reason to believe Javier presented a threat to anyone, and had no probable cause to justify an arrest. Additionally, they had no justification for use of a Taser against Javier, particularly in "probe" mode rather than "drive stun" mode, because Javier presented no threat to them or anyone else.



27.     After suffering the physical strikes and electrical shocks, Javier began to crawl away and then was able to stand.  Smith then struck Javier in the chest with his knee. Then, while Javier, surrounded by Defendant Officers, held his hands out in submission, Cruz, at Paz's

urging ("Do it again, bro!") shocked Javier again with the Taser, causing him to fall hard to

the ground. Again, it was clear that Javier presented no threat to the officers or anyone, and yet

Mabes, Cruz, Paz, and Smith continued their unlawful abuse of him.





28.    Javier stood again and began to walk away from Defendant Officers.  As Javier walked

away,  Defendant Paz, said "that's okay I got spray" and  approached Javier.  Defendant Paz

discharged an OC spray device into Javier's face.  Javier continued to walk. There continued

to be no justification for the officers to detain or use force against Javier, including the use of

pepper spray, because there because they had no reasonable suspicion necessary to justify an

investigative detention, had no reason to believe Javier presented a threat to anyone, and had

no probable cause to justify an arrest. The officers had no justification for preventing Javier

from leaving the scene.



29.     Javier had only moved a  short distance further when Defendants Bennett and Smith approached from behind and forcefully grabbed Javier around his neck and shoulder.  The Defendants Bennet and Smith then tackled Javier and slung him to the ground again, slamming the back of Javier's head into the ground. There continued to be no justification for the officers to detain or use force against Javier, including the use of pepper spray, because there because they had no reasonable suspicion necessary to justify an investigative detention, had no reason to believe Javier presented a threat to anyone, and had no probable cause to justify an arrest. The officers had no justification for preventing Javier from leaving the scene.



30.     After Javier was on the ground again,  Defendant Officers Paz, Smith and Bennett pushed Javier down into the ground by placing their weight on him.  During this time Defendant Officers were again striking Javier with their fists and kicking Javier with boots on his head and body.  Defendant Smith said "Quit fucking moving.  I'm going to kick you hard." and then did so with his boot, once in the arm and once in the stomach.  Defendant Paz also kicked Javier.  Defendant Bennett applied his thumb to a location behind Javier's ear causing

injuries to his head and ear.  Defendant Bennett kept his thumb at that location for an extended period of time.  During the same time, Defendant Paz had both hands behind Javier's neck at this time, pushing his head to the ground.  Defendant Dever, arrived and pushed Javier's head to the ground again as the other Defendants held him.  These actions went on for a period of time.  Defendant Dever said "give me your fucking hand" and again pushed javiers head to the ground.   At some point, Javier was handcuffed by Defendants, including Dever. There continued to be no justification for the officers to detain or use force against Javier, including handcuffing him, because there because they had no reasonable suspicion necessary to justify an investigative detention, had no reason to believe Javier presented a threat to anyone, and had no probable cause to justify an arrest.



31.     Javier's behavior and condition had drastically changed since the initial contact due to the beating he had received from the officers.   Javier had spoken clearly with Defendant Paz and Mabes just a few minutes before, Javier was now disoriented and unable to communicate. Six minutes had passed since Defendant Cruz and Mabes first threw Javier to the ground.



11

32.      Defendant Wright, a detective, was present for some or part of this time.  Defendant Paz then hobbled Javier's legs, although he was lying on the ground, disoriented and not attempting to stand up.  Several of the Defendants had placed their knees on different parts of Javier's prone body.    As the Defendants stood over Javier, he requested water repeatedly. Defendants, including Paz, Lockmondy and Dever, attempted to load Javier into one of the police cars by lifting him by the extremities and carrying him to the rear of the vehicle.  After pushing handcuffed Javier into the seat and floorboard, Javier fell backward to the ground. Defendants taunted him after he fell.  Defendant Lockmondy told Javier he would get water for him.  Defendant Dever stood over Javier and said "You look like a fish right now…is that on purpose?"  Lockmondy then stood over Javier and saying "Here's your fucking water for you.", dropped a bottle of water near Javier.  Defendant Lockmondy then walked away. There was no justification for the continued detention and use of force against Javier, who was now handcuffed and incapacitated, because the officers still had no reasonable suspicion to justify a investigative detention, no probable cause to justify an arrest, and no reason to believe that Javier presented a threat to anyone. At this stage, Javier clearly needed medical attention, not to be handcuffed and abused.

33.      Defendant Dever then pushed Javier into a sitting position and held him in that position as Defendant Wright held water in front of him.  Detective Wright asked Javier if he wanted water and then stood up when Javier failed to respond quickly enough.  Dever, who was supporting a near unconscious Javier, then cruelly allowed Javier to drop back to the ground without support. This was an act of wanton cruelty against a helpless, handcuffed person in clear need of medical attention, and certainly not justified by any law.



34.     Although the Defendants treated themselves for effects of OC spray by washing their faces with water, none treated Javier to reduce the effects of the OC spray.  Javier had at least one seizure at this time.  After this point, Javier never regained his mobility or mentation again.  The officers showed nothing but indifference to Javier, who was wholly under the power of the officers and clearly in need of medical attention, was simply allowed to lay in place.

35.     The Defendant Officers called Emergency Medical Services to the scene.  During the time before arrival of Emergency Medical Services and while Javier was handcuffed, the Defendant Officers offered no medical assistance to Javier nor did they attempt to remove the CS residue from his face.  Javier repeatedly asked for water and was denied.  In fact, they openly exhibited a callous disregard for Javier's wellbeing.  Javier experienced seizures at the scene and, at one point, was near death.  At this point, several Defendants expressed concern for themselves if Javier died and, as Javier again began breathing, these same Defendants began joking over his prone, semi-conscious body.   Defendant Paz then volunteered "I'm hot" to other Defendants to indicate that his camera was recording.

36.     Javier was taken to Bayshore Hospital by ambulance, where, approximately twenty hours later, Javier died as a result of the he injuries he sustained at the hands of the Defendant Officers.  Javier was twenty-two years old.



37.     Despite Defendants' repeated assertions that Javier had ingested an intoxicant, such as alcohol, LSD, "Kush," or even designer drugs like 25i-NBOMe, no evidence of any narcotic or intoxicant was found in the medical examinations by either Bayshore Hospital or the Medical Examiner.  In fact, the Medical Examiner tested Javier for more than 100 different intoxicants, including alcohol, LSD, designer psychoactives including 25i-NBOMe, and numerous synthetic canniboids. No intoxicants at all were found in Javier's system, other than an unconfirmed, "presumptive positive" for marijuana metabolites.  Javier's cause of death was determined to be homicide.

38.     Defendant Bennett struck Javier at least twice with his fists, once with his knee and applied "mandibular angle pressire point" behind Javier's ear. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

39.     Defendant Dever struck Javier with his hands, pushed him into the ground, kicked Javier with his feet and intentionally dropped an incapacited, handcuffed Javier to the ground

after lifting him up. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

40.     Defendant Cruz fired his CEW device into Javier, kicked Javier at least once and struck Javier with his fist at least once. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

41.     Defendant Paz sprayed OC spray into Javier's face, placed pressure behind Javier's right ear, struck Javier with his hands, struck Javier with his knees, and kicked Javier with his foot. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

42.     Defendant Mabes struck Javier with his fists and kicked Javier with his feet. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

43.     Defendant Smith grabbed Javier from behind and threw him to the ground, striking his head and struck Javier with his fists and placed his knee on Javier's neck. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

44.     Defendant Dever handcuffed Javier, and while Javier was handcuffed and incapacitated, lifted Javier and then dropped him to the ground, allowing Javier's head to strike the ground. There was no legal justification for any of these acts, and each constituted a violation of Javier's rights under the Fourth, Fifth, and Fourteenth Amendments.

45.     Some or all of the Defendant Officers struck, kicked, and threw Javier, discharged the CEW's into him, and sprayed him with OC spray, despite the fact that he did not threaten, attack, or resist the Defendant Officers, was never a threat to the Defendant Officers at the time

of the conduct. The Defendant Officers had no probable cause or reasonable suspicion of a crime existed to support detention or arrest of Javier, nor did they ever arrest Javier. Defendant Officers at the scene communicated with Javier prior to beating, tasing and OC spraying him. None indicated suspicion of intoxication at that time, but rather were concerned with Guido. Despite the lack of any reasonable suspicion of a crime, Defendant officers beat, kicked, tased and OC sprayed Javier and, at no time during the events described herein did any officer make effort to intervene. Rather, Defendant officers joked about the incident and regularly warned others that recording devices were present while discussing the incident. The Defendant Officers' conduct violated the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

46.     The force initiated by and/or the failure to intervene in the use of said force, by some or all of the Defendant Officers caused an unreasonable seizure to Javier.

47.     Javier did not obstruct justice or resist arrest, nor did he batter or assault any of the Defendant Officers. The extensive testing of his bodily fluids confirmed that Javier was not intoxicated as Defendants claimed, and Javier exhibited no symptoms that would lead a reasonable person to believe he was intoxicated.

48.     On April 27, 2018, at the time of the incident, Javier did not commit any act contrary to the law.

49.     As a direct and proximate result of one or more of the aforesaid acts or omissions of the Defendant Officers suffered injury and tragically died.

50.     On or about April 27, 2018, the Defendant Officers were on duty at all times relevant to this Petition. Officers Mabes, Paz, Lockmondy, Hardy, Wright, Bennett, Cruz and Dever were sworn peace officers employed by the City of Pasadena and the Pasadena Police

Department (PPD). Officer Smith was a sworn peace officer employed by Pasadena Independent School District (PISD). The Defendant Officers engaged in the conduct complained of herein, on said date, in the course and scope of employment and while on duty.

51.     The conduct of the Defendant Officers and Javier's death were the result of policies, practices, and customs of the PPD, adopted and promulgated by the policymakers of that body--namely, the Chief of Police or, alternatively, the Mayor and City Council—and of PISD through the policymakers of that body—namely, the Chief of the Police for PISD or, alternatively, the superintendent and school board. The following are express policies, practices, and customs instituted by the policymakers of the PPD and PISD, or, in the alternative, are tacit policies, practices, and customs the policymakers have either actively promoted or, through deliberate indifference, allowed to exist within PPD, or are widespread practices that are so common and well-settled as to constitute a custom that fairly represents City and PISD policy:

   a.   Using excessive, and oftentimes deadly force, to carry out otherwise routine arrests or stops.

   b.   Using excessive and deadly force when such force is not necessary or permitted by law.

   c.   Ignoring the serious need for training and supervision of its officers in regards to the use of force.

   d.   Failing to discipline those persons whom are found to have engaged in the use of excessive force upon those entrusted to their care and/or under their control.

   e.   Failing to adequately supervise and/or observe its officers.

f.  Failing to adequately train officers regarding the availability of alternative means of detaining persons other than the use of force or deadly force.

g.  Failing to discharge officers who have shown a pattern or practice of using excessive force;.

h.  Failing to adopt and enforce appropriate procedures for use of Tasers or other CEWs.

i.  Failing to adopt and enforce appropriate procedures for use of OC Spray.

j.  Failing to adopt and enforce appropriate procedures for identification of officers.

k.  Failing to adopt and enforce sufficient de-escalation procedures for officers.

l.  Failing to adopt and enforce sufficient training and supervisory procedures regarding detention and restraint of individuals.

m.  Adopting a practice whereby officers who are unfit for peace officer duties, as shown by prior actions in the line of duty, are allowed to retain their positions.

n.  Detaining citizens without reasonable suspicion that the citizen is involved in criminal activity, without any reason to believe the citizen is armed or presents any threat to the officer or to the public, and without probable cause to believe that the citizen has committed a crime.

o.  Restraining and handcuffing citizens without reasonable suspicion that the citizen is involved in criminal activity, without any reason to believe the citizen is armed or presents any threat to the officer or to the public, and without probable cause to believe that the citizen has committed a crime.

p.  Using both non-deadly and deadly force as a first resort to enforce compliance by citizens with officer's commands, without regard whether such force is legally

justified or reasonably necessary to protect the lives or safety of others or to effect a lawful arrest, and without any attempt to use lesser force or to de-escalate the situation without force.

q.  Immediately manhandling and striking citizens who do not immediately submit to handcuffing or restraint, without making any attempt to de-escalate or resolve the situation without force, during a purported investigative detention where the subject presents no threat.

r.  Using "less lethal" weapons like Tasers, without making any attempt to de-escalate or resolve the situation without force, during a purported investigative detention where the subject presents no threat.

s.  Using "Tasers" on "probe" rather than "drive stun" mode on citizens who do not present any threat, simply to compel compliance to restraint during a purported investigative detention where the subject presents no threat.

t.  Using joint-manipulation techniques on citizens, simply to compel compliance to restraint during a purported investigative detention where the subject presents no threat.

u.  Spraying OC spray into the face of citizens to compel, simply to compel compliance to restraint and to prevent the citizen from leaving the scene, during a purported investigative detention where the subject presents no threat.

v.  Preventing citizens from peacefully leaving an encounter where the citizen is not under arrest and where there is no legal basis to detain the citizen.

w.  Forcibly tackling citizens, without any measure taken to avoid injury to the citizen, simply to prevent the citizen from leaving the scene, during a purported investigative detention where the subject presents no threat.

x.  Withholding first aid from restrained citizens in clear need of medical attention.

y.  Allowing other officers to violate the constitutional rights of citizens, assisting other officers in the violation of citizens' rights, and concealing the violation of citizens' rights by officers.

52.   PPD has not disclosed its written policies and procedures. However, it is clear that each of these unconstitutional practices listed above are the express or tacit policy of the PPD and PISD Police, because the Defendant Officers openly engaged in these practices with the full knowledge of the PPD's and PISD's policymakers—at times even in the presence of senior officers—and not one of the Defendant Officers was punished, reprimanded, or even informally corrected. Additionally, the lack of action by PPD's and PISD's policymakers constitute a ratification of these unconstitutional policies.

53.   These policies were carried out by PPD's and PISD's officers, and directly caused the violation of the constitutional rights of, and the injuries to and death of, Javier.

54.   The Chief of Police for the City of Pasadena is the final policymaker for the PPD because has been granted power and mandated by the city council and under the city charter to direct and manage the department and to determine plans and policies to be observed in police operations, and he performs this role independently of the mayor or city council. Moreover, through their lack of any meaningful regulation or oversight of PPD, the mayor and city council have abdicated any policymaking power to the Chief of Police.

55.     Likewise, the Chief of Police for PISD is the final policymaker for the PISD Police because he has been granted power and mandated by the school board to direct and manage the department and to determine plans and policies to be observed in police operations, and he performs this role independently of the superintendent or school board. Moreover, through their lack of any meaningful regulation or oversight of their police department, the superintendent and school board have abdicated any policymaking power to the Chief of Police. Additionally, PISD's official policy manual is expressly approved and signed by the Chief of Police.

56.     If the Chiefs of Police of the City and PISD, respectively, are not the final policymakers, then the governing bodies of the two entities—the mayor and city council of the City and the superintendent and school board of PISD—are the final policymakers. The governing bodies have promulgated no relevant rules or regulations governing the conduct of their respective policy departments, have engaged in no meaningful oversight of the police departments, and have exhibited deliberate indifference to their respective police departments' violations of citizens' constitutional rights. It is obvious that such a failure of oversight would result in constitutional violations such as those committed against Javier.

57.     Both PPD and PISD have exhibited a pattern of similar excessive force incidents, including incidents resulting in death, with at least the acquiescence of PPD's and PISD's policymakers. These unpunished, unlawful uses of force constitute such a common, well-settled, and widespread practice that it fairly represents the policy of the City and PISD. For example:

a.   In 2007, Pedro Gonzales was beaten to death by PPD officers using knee strikes, elbow strikes, and fists. No PPD officer was punished.

Case 4:20-cv-01881   Document 25   Filed on 08/21/20 in TXSD   Page 22 of 31

b. In 2012, Jose Sauceda, Jr., was beaten and hogtied by PPD officers. He died on a stretcher when transported to Bayshore Hospital. No PPD officer was punished.

c. Between 2012 and 2015, PISD had 129 use of force incidents.

d. In 2012, Pasadena ISD police shot and critically wounded an unarmed 14-year-old. No PISD officer was punished.

e. In 2015, Pasadena ISD police struck a 16-year-old student 18 times with a metal baton simply because he loudly demanded his phone. No PISD officer was punished.

58.    Additionally, the conduct of the Defendant Officers and Javier's death were the result of PPD's and PISD's failure to train the Defendant Officers. Regardless of whether PPD and PISD adopted state training standards, their respective Chiefs of Police remain responsible for ensuring that their respective officers are actually trained, competent, and fit for service. The training actually received by the Defendant Officers was defective in multiple respects:

a. The Defendant Officers were not adequately trained in the use of force, including both when and to what degree to employ it. They were not trained to use only that force reasonably necessary to protect the lives and safety of themselves and the public or to effect a lawful arrest, and to do so with due regard for the health and safety of the subject.

b. The Defendant Officers were not adequately trained to de-escalate situations without the use of force prior to using force, or how to do so.

c. The Defendant Officers were not adequately trained on when an investigative detention under *Terry v. Ohio* is justified, and were not trained to recognize that

they must have a reasonable suspicion that the subject is engaged in criminal activity.

d. The Defendant Officers were not adequately trained on when a subject may be handcuffed or otherwise physically restrained during an investigative detention.

e. The Defendant Officers were not adequately trained in recognizing whether a subject is actually intoxicated.

f. The Defendant Officers were not adequately trained to recognize when a subject is actually a threat to the safety of officers or the public.

g. The Defendant Officers were not adequately trained in when and how to employ Tasers, including when to use the "drive stun" rather than "probe" functions.

h. The Defendant Officers were not adequately trained in when and how to employ dangerous striking and grappling techniques on a subject, including fist and knee strikes, joint locks, and throws to the ground. They were not trained how to avoid serious injury to the subject when using such techniques, nor were they trained to refrain from such techniques unless necessary.

i. The Defendant Officers were not adequately trained in when and how to employ OC spray on a subject, including when the use of OC spray is justified.

59. PPD and PISD knew that these training failures were likely to result in the violations of citizens' constitutional rights. Deaths resulting from techniques used by the Defendant Officers, such as slamming Javier's head into the ground, are well-documented, as are deaths resulting from CEWs . It was a highly predictable consequence of PPD's and PISD's failure to train that a person like Javier could be severely injured or killed by PPD's and PISD's officers, and that is exactly what occurred here.

## IV.   Causes of Action

*Count 1—42 U.S.C. § 1983, Excessive Force*

60.     At all times relevant to this Petition, the Defendant Officers were acting under color of state law, ordinance and/or regulation, statutes, custom and usages of the City and PISD. The Defendant Officers were also acting in concert with one another.

61.     The actions and/or omissions of the Defendant Officers described above amounted to an unjustified and excessive use of force against Javier.

62.     By unjustifiably and unreasonably handcuffing, detaining, arresting, striking, kicking, lacing their body weight upon, electrocuting, spraying with OC spray and throwing him to the ground, the Defendant Officers violated Javier's rights to be free from unreasonable searches and seizures under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution in multiple ways, including:

   a.   By using excessive and deadly force in the course of Defendants' attempt to seize and the seizure of Javier, in violation of the Fourth Amendment and its reasonableness standard. Javier was unlawfully arrested, beaten, and subjected to the unnecessary use of weapons such as the Taser CEW and OC spray. The Defendant Officers employed force that was clearly excessive to the need, and was objectively and subjectively unreasonable;

   b.   By unnecessarily striking, kicking, tasing, using pepper spray and dragging and throwing Javier to the ground;

   c.   By failing to provide timely medical attention and preventing same from being timely rendered, where it was clearly necessary and required by law; and

   d.   By failing to provide supervision and/or proper training to prevent such incidents of excessive force.

24

63.     Defendants the City and PISD are liable for the constitutional torts of Defendant Officers because Defendants the City and PISD sanctioned customs, practices, and policies, described in detail above.

64.     The conduct of Defendants described above proximately caused the injuries to and death of Javier and the violation of his civil rights under the Fourth, Fifth, and Fourteenth Amendments.

### Count 2—42 U.S.C. § 1983, False Arrest

65.     On the morning of April 27, 2018, the Defendant Officers handcuffed, detained, and beat Javier without probable cause to believe that Javier had committed a criminal offense and without reasonable suspicion that Javier had ever been engaged in criminal activity.

66.      Therefore, the conduct of the Defendant Officers was in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

67.     Defendant Officers' conduct, and the unlawful detention of Javier, were the result of the policies and customs of the City and PISD as described above, and by the City's and PISD's failure to train its officers as described above.

68.     The aforementioned actions of Defendants were a direct and proximate cause of the constitutional violations, injuries, and/or death of Javier and damages suffered by Plaintiffs, as set forth more fully below.

69.     The conduct of Defendants described above proximately caused the injuries to and death of Javier and the violation of his civil rights under the Fourth, Fifth, and Fourteenth Amendments.

### Count 3—42 U.S.C. § 1983, Civil Conspiracy

70.     At the time of Javier's injuries, a meeting of the minds occurred between all individual Defendant Officers

71.     The Defendant Officers conspired with the purpose of unlawfully detaining, arresting, using force against Javier without legal justification, thereby violating Javier's rights under the United States Constitution.

72.     Specifically, the Defendants conspired to violate Javier's constitutional rights in the following manner:

  a. Defendant Officers agreed to detain, arrest and cause injury to Javier intentionally, without consent, without justification and without adequate monitoring.

  b. Defendant Officers agreed to hold Javier on the ground, Defendant Officers permitted and assisted the Defendant Officers as they hit, struck, kicked, electrocuted Javier and threw him to the ground.

  c. Defendant Officers generated false documentation to cover-up for their own and each other's misconduct, including, but not limited to, one officer compiling a single report for this incident.

  d. Defendant Officers committed overt acts in furtherance of the above conspiracy by communicating among themselves on April 27, 2018, and for a period of time thereafter, whereby the individual defendants agreed to facilitate, engage in and support the activity which occurred in connection with the allegations immediately above. The Defendant Officers also committed overt acts in furtherance of the conspiracy by completing the agreed upon actions as described above.

73.     As a result of this conspiracy, the Defendant Officers, by and through their conduct, proximately caused the death of Javier.

74.     The actions of the Defendant Officers further demonstrate that the Defendant Officers failed in their duty to enforce the laws equally and fairly towards Javier.

75.     The aforementioned actions of Defendant Officers were a direct and proximate cause of the constitutional violations, injuries, and/or death of Javier and damages suffered by Plaintiffs, as set forth more fully below.

76.     The conduct of Defendants described above proximately caused the injuries to and death of Javier and the violation of his civil rights under the Fourth, Fifth, and Fourteenth Amendments.

### Count 4—42 U.S.C. § 1983, Deliberate Indifference

77.     On the morning of April 27, 2018, Javier was placed under the control and custody of the Defendant Officers. During this period of time, he was struck and kicked until he was unresponsive and undergoing seizures.

78.     At this point, the Defendant Officers knew that Javier was at serious risk to his physical health and welfare.

79.     The Defendant Officers did not check his vitals or any other measure of his physical condition. The Defendant Officers did not inform or instruct the paramedics or any other medical personnel to check on Javier's physical condition.

80.     Instead of assisting Javier, one or more of the Defendant Officers put his bodyweight on Javier and pressed Javier into the ground. During this time Javier did not move his body and was completely unresponsive.

81.     Instead of assisting Javier, one or more of the Defendant Officers, stood nearby and took no action.

82.     The aforementioned actions of Defendant Officers were a direct and proximate cause of the constitutional violations, injuries, and/or death of Javier and damages suffered by Plaintiffs as set forth more fully below.

83.     Therefore, the Defendant Officers' conduct violated Javier's rights under the Fourth,

Fifth, and Fourteenth Amendment of the United States Constitution.

84.     Plaintiffs seek unliquidated damages within the jurisdictional limitations of this court.

## V.     DAMAGES AND REMEDIES

85.     As detailed above, Plaintiffs requests that they have judgment against Defendants for

actual damages for the wrongful death of Javier, including but not limited to:

   a.   Loss of contribution of a pecuniary value that they would have received from
        Javier, had he lived;

   b.   Loss of companionship and society that they would have enjoyed with Javier,
        had he lived;

   c.   Mental anguish and grief due to Javier's death;

   e.   Loss of inheritance that they would have received from Javier, had he lived;

86.     Additionally, Plaintiff Debany Rivera requests that she have judgment in her capacity

as the heir of Javier for damages suffered by Javier, including but not limited to:

   a.   Reasonable and necessary medical expenses;

   b.   Earning capacity lost both prior to his death;

   c.   Earning capacity Javier would have enjoyed had he lived;

   e.   Pain and mental anguish;

   f.   Physical impairment;

   g.   Physical disfigurement;

   h.   Compensation for the unlawful arrest and detention of Javier; and

   i.   Reasonable funeral and burial expenses.

87.     Additionally, Plaintiffs request attorney's fees and expert fees pursuant to 42 U.S.C. § 1988(b) and (c).

88.     Pursuant to Rule 47(c), Plaintiffs state that they seek monetary relief over $1,000,000.00. This statement is made to provide information regarding the nature of Plaintiffs' claims as required by Rule 47(c), and is made without prejudice to Plaintiffs' rights and subject to Plaintiffs' right to amend.

## VI.     CONDITIONS PRECEDENT

89.     All conditions precedent to Plaintiffs' rights to recovery have occurred or have been fulfilled.

## VII.     PRESERVATION OF EVIDENCE

90.     Plaintiffs hereby request and demand that Defendants and their agents, attorneys, and insurers preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom, including but not limited to statements, photographs, videotapes, audiotapes, recordings, business or medical records, bills, estimates, invoices, checks, measurements, equipment, vehicles, correspondence, memoranda, files, facsimiles, email, voice-mail, text messages, or cellular telephone records. Failure to maintain such items will constitute "spoliation" of the evidence and may subject Defendants to sanctions.

## VIII.  PRAYER

91.     For the reasons stated above, Plaintiffs Debany Rivera, in her individual capacity and as heir to the estate of Juan Javier Martinez, Jr., Deceased, and Juan Javier Martinez, Sr., respectfully request that Defendants City of Pasadena, Pasadena Independent School District, Lonnie Smith, II, Zachary Mabes, Jesus Paz, Joseph Lockmondy, Mark Hardin, Donna Wright,

Paul Bennett, Timothy Dever, and Federico Cruz, be duly cited to appear and answer herein, and that Plaintiffs have and recover of Defendants judgment for actual damages, attorney's fees, expert fees, pre- and post-judgment interest, costs of court, and such other and further relief to which he may be entitled at law or in equity.

Respectfully Submitted, this the 21st day of August, 2020,

**GABEL LAW PLLC**

*/s/ Christopher Gabel*
**Christopher Gabel**
State Bar No. 24089408
720 Rusk St.
Houston, Texas 77002-2713
chris@gabellawpllc.com
Telephone: 713-429-4477
Facsimile: 713-429-5546

**ROBERT G. TAYLOR, II, P.C.**

*/s/ Robert G. Taylor, III (Trey)*
**Robert G. Taylor, III (Trey)**
State Bar No. 19721100
2040 North Loop West, Suite 104
Houston, Texas 77018
ttaylor@rgtaylorlaw.com
Telephone: 713-654-7799
Facsimile: 713-654-7814

**HUMPHREY LAW PLLC**

*/s/ Brian Humphrey*
**Brian Humphrey**
State Bar No. 24074456
TC Energy Center
700 Louisiana, Suite 3950
Houston, Texas 77002
brian@htx-law.com
Telephone: 713-364-2616
Facsimile: 832-827-3299
***Attorneys for Plaintiffs***

30

CERTIFICATE OF SERVICE

I hereby certify that this document was served on all attorneys of record and/or unrepresented parties in accordance with Rule 5 and Local Rule 5.5 as indicated below on August 21, 2020.

**William S. Helfand**
**Norman Ray Giles**
LEWIS BRISBOIS BISGAARD & SMITH, LLP
24 Greenway Plaza, Suite 1400
Houston, Texas 77046
*Via ECF*

**Larry Simmons**
**Carmen Jo Rejda-Ponce**
GERMER PLLC
America Tower
2929 Allen Parkway, Suite 2900
Houston, Texas 77019
*Via ECF*

*/s/ Robert G. Taylor, III*
Robert G. Taylor, III (Trey)

31