United States District Court
Southern District of Texas

**ENTERED**

August 16, 2021

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DEBANY RIVERA, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 20-cv-01881 |
| | § | |
| CITY OF PASADENA, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Juan Javier Martinez, Jr. died after a violent encounter with Pasadena, Texas police. During the encounter, nine officers used a taser, pepper spray, and significant and repeated force to subdue Martinez. His widow and father allege that the police officers caused Martinez's death. The amended complaint asserts § 1983 claims for false arrest, excessive force, civil conspiracy, and deliberate indifference against the individual officers, and the entities that employed them, the City of Pasadena and the Pasadena Independent School District. (Docket Entry No. 25).

The defendants answered and have moved to dismiss the amended complaint. (Docket Entry Nos. 27, 28, 34, 45). All defendants assert that the force used was reasonably necessary, the individual defendants invoke qualified immunity, and the City and School District assert that municipal liability does not apply. The plaintiffs responded, and the defendants replied. (Docket Entry Nos. 38, 40, 46, 47, 48, 49).

On the limited record available and under binding precedent, factual disputes material to determining qualified immunity preclude dismissal at this stage of the unlawful-arrest claim against one individual officer and excessive-force claim against another officer. These disputes

also make this case ill-suited for interlocutory appeal.  The claims against the remaining individual defendants and the City and School District are dismissed.

The motions present issues that have led some judges to question whether "the judge-made immunity regime ought not be immune from thoughtful reappraisal."  *Zadeh v. Robinson*, 928 F.3d 457, 474 (5th Cir. 2019) (Willett, J., concurring in part), *cert. denied*, 141 S. Ct. 110 (2020).  The reasons for the ruling are set out below, but the underlying doctrinal questions remain.

## I.     Background

### A.  The Complaint Allegations

In the early morning of April 27, 2018, Javier Martinez was in Strawberry Park in Pasadena, Texas, with another individual, Guido Capello, who was clearly distressed and appeared intoxicated.   (Docket Entry No. 25 ¶¶ 17–18).   Pasadena Police Department Officer Paz approached Martinez, Guido Capello, and Mara Capello, who identified herself as Guido Capello's sister.  (*Id.* at ¶ 18).  Guido Capello was behaving erratically, and Mara Capello told Officer Paz that Guido "took something" and "need[ed] to go to the hospital."  (*Id.*).

Officers Cruz and Mabes arrived soon after.  Capello became more agitated.  (*Id.* at ¶ 20). Martinez moved toward Capello, prompting Officer Paz to tell Martinez to "get away."  (*Id.*).  Paz and Cruz handcuffed Capello.  (*Id.*).  Officer Mabes instructed Martinez to stay by Mabes's patrol car and yelled at Martinez to "stop moving."  (*Id.* at ¶ 21).  Officer Mabes grabbed Martinez's right arm and pushed him back against the car.  (*Id.* at ¶ 22).  Officers Mabes and Cruz turned Martinez to face the car and then forced him to the ground.  (*Id.* at ¶ 23).  The officers ordered Martinez to roll over, but did so while they pushed and pulled at him, which impeded his ability to comply with the command.  (*Id.*).

2

Officer Smith arrived and pushed Martinez's head to the ground, then placed his knee on Martinez's neck.  (*Id.* at ¶¶ 24-25).  As Officers Mabes, Paz, and Smith tried to keep Martinez on the ground, Officer Cruz tased Martinez for the first time.  (*Id.* at ¶¶ 25-26).  Despite the tasing, Martinez started crawling away, then stood.  (*Id.* at ¶ 27).  Officer Smith struck him in the chest with his knee, and Officer Cruz tased him again.  (*Id.*).  Despite the second tasing, Martinez got to his feet and started to walk away.  (*Id.* ¶ 28).  Officer Paz discharged pepper spray in Martinez's face, and Officers Smith and Bennett tackled Martinez, brought him to the ground, and held him down by placing their weight on him.  (*Id.* at ¶¶ 29–30).

While Martinez was on the ground, various officers struck him with their fists, kicked him, and one pressed his thumb against Martinez's head.  (*Id.* at ¶ 30).  The officers succeeded in handcuffing Martinez after "a period of time."  (*Id.*).  After Martinez was handcuffed, Officer Dever pushed the "near unconscious" Martinez into a sitting position and then allowed him to fall back to the ground.  (*Id.* at ¶ 33).  Martinez then had at least one seizure.  (*Id.* at ¶ 34).  At some point, the officers called an ambulance.  (*Id.* at ¶ 35).  Martinez remained semiconscious.  Despite his repeated requests, the officers did not provide Martinez with drinking water or wash the pepper spray residue off his face while they waited for the ambulance to arrive.  (*Id.* at ¶¶ 34–35).  The officers expressed concern about what would happen to them if Martinez died, and one reminded the other officers that his body camera was recording by telling them "I'm hot."  (*Id.* ¶ 35).  The ambulance arrived and took Martinez to the hospital.  Martinez died in the hospital approximately 20 hours later.  (*Id.* at ¶ 36.)

### B. The Record Evidence

A preliminary issue is what evidence the court may consider in analyzing the complaint and the Rule 12(b)(6) motions to dismiss.  The plaintiffs and the defendants offer dramatically different accounts of the events leading up to Martinez's death.  The defendants argue that the court may consider the defendant officers' body camera recordings and must rely on that evidence when it contradicts the complaint allegations.[1]  (Docket Entry No. 27 at ¶¶ 15–16).  The plaintiffs agree that the court may consider the body camera evidence but caution that the court may not adopt the video evidence over the complaint allegations unless that evidence conclusively contradicts those allegations.  (Docket Entry No. 38 at 15).

When defendants attach to a Rule 12(b)(6) motion to dismiss video evidence that is referred to in the complaint and central to it, a court may consider that evidence.  *Inclusive Cmty. Project, Inc. v. Lincoln Prop*. Co., 920 F.3d 890, 900 (5th Cir. 2019); *Hartman v. Walker*, 685 F. App'x. 366, 368 (5th Cir 2017) ("[O]n a motion to dismiss, the court is entitled to consider any exhibits attached to the complaint, including video evidence . . . [and] the court is not required to favor plaintiff's allegations over the video evidence.").  But the district court "should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account."  *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 730 (5th Cir. 2018); *see also Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013) (citing *Scott v. Harris*, 550 U.S. 372 (2007)).

The plaintiffs referred to the body camera recordings in the complaint, and they are central to their claims.  (*See* Docket Entry No. 25 at 4, 6–11 (screen captures from the body camera

---

[1] Several of the defendants also argue that the court should consider Martinez Jr.'s autopsy records but fail to provide them as attachments to their motion to dismiss.  (*See* Docket Entry No. 27 at 14).

footage)).   The court considers the recordings in analyzing the pleadings and the motions to dismiss, but discounts the complaint allegations in favor of the video evidence only when that evidence "blatantly contradict[s]" the plaintiffs' well-pleaded factual allegations.  *Ramirez,* 716 F.3d at 375; *Griffin v. City of Sugar Land, Texas*, 2019 WL 175098, *6 (S.D. Tex. Jan. 11, 2019), *aff'd*, 787 F. App'x 244 (5th Cir. 2019) (adopting the video evidence over the complaint allegations when the video showed the plaintiff violating a city ordinance, clearly contradicting his complaint allegation that the arresting officers lacked probable cause to arrest him).

## II.    Legal Standard

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  (quoting *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Lincoln*

5

*v. Turner*, 874 F.3d 833, 839 (5th Cir. 2017) (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  "A complaint 'does not need detailed factual allegations,' but the facts alleged 'must be enough to raise a right to relief above the speculative level.'" *Cicalese v. Univ. Tex. Med. Branch*, 924 F.3d 762, 765 (5th Cir. 2019) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (alterations omitted) (quoting *Twombly*, 550 U.S. at 558).

A court reviewing a motion to dismiss under Rule 12(b)(6) may consider "(1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019).

## II.     The Claims Against the Individual Officers

The officer defendants argue that the plaintiffs have failed to plausibly allege that the officers violated Martinez's constitutional rights or, in the alternative, that the allegations fail to survive qualified immunity.  (Docket Entry No. 27 at 9-11; Docket Entry No. 34 at 1, 8; Docket Entry No. 45 at 2–4).  "The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 347 (5th Cir. 2017) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)).  "This immunity protects 'all but the

plainly incompetent or those who knowingly violate the law.'" *Swanson*, 659 F.3d at 371 (quoting *Malley v. Briggs*, 45 U.S. 335, 341 (1986)). Once a defendant has asserted qualified immunity, the plaintiff must prove that the defendant "(1) 'violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Brinsdon*, 863 F.3d at 347 (quoting *Swanson*, 659 F.3d at 371). The court may begin by analyzing either qualified-immunity step. *See Pearson v. Callahan*, 555 U.S. 223, 236–42 (2009).

### A.    The Claims of Unconstitutional Seizure, Detention, or Arrest

The plaintiffs allege that the "[o]fficers handcuffed, detained, and beat [Martinez] without probable cause to believe that [Martinez] had committed a criminal offense and without reasonable suspicion that [Martinez] had ever been engaged in criminal activity." (Docket Entry No. 25 at ¶ 65). The plaintiffs allege unconstitutional seizure, detention, or arrest at several points throughout the escalating encounter.

- Mabes "unlawfully detained" Martinez when Mabes had him stand by the car. (*Id.* at ¶ 21).

- Mabes unlawfully detained or arrested Martinez when Mabes "reached forward and grabbed [Martinez]'s right arm and pushed him against the car." (*Id.* at ¶ 22).

- Cruz, Mabes, and Paz unlawfully detained Martinez when they "forced [Martinez] to the ground on his right side." (*Id.* at ¶ 23).

- Mabes, Cruz, Paz, and Smith unlawfully detained Martinez by "pulling, pushing or placing bodyweight on [Martinez] and shouting varying instructions." (*Id.* at ¶ 25).

The officers dispute that the video footage shows any unconstitutional seizure, detention, or arrest. (*See* Docket Entry No. 27 at 7). Each part of the encounter is analyzed below.

### 1. The Initial Stop

The plaintiffs allege that Martinez was in a public park in Pasadena, attempting to calm another man, Guido Capello, who was "emotionally upset." (Docket Entry No. 25 at ¶ 17). Around 6:50 am, Officer Paz arrived and approached Mara Capello, Guido's sister, Martinez, and Capello. "Guido was shouting, clearly upset, and was being restrained by [Martinez]." (*Id.* at ¶ 18). Mara Capello told Paz that Guido Capello "'took something'" and needed "'to go to the hospital.'" (*Id.* at ¶ 18). While Officer Paz tried to speak with Guido Capello, Martinez attempted to calm Capello. (*Id.* at ¶ 19). Unlike Capello, Martinez exhibited "no signs of intoxication." (*Id.*) After Paz restrained Guido Capello and told him he was not under arrest, Capello became more agitated. (*Id.* at ¶ 20). Martinez continued to approach Capello, and Officer Paz yelled at Martinez to stay away. (*Id.*). Martinez moved away, "approximately fifteen to twenty feet from the car." (*Id.*). "At this point, Defendant Mabes was speaking with [Martinez]. . . [Martinez] was walking and displayed no signs of intoxication." (*Id.*). Officer Mabes then "requested [Martinez] move to the front left side of the car he had driven." (*Id.* at ¶ 21). Martinez did so.

"[N]ot all detentions are arrests, and not all detentions must be based on probable cause." *Emesowum v. Cruz*, 756 F. App'x 374, 378 (5th Cir. 2018). An investigatory stop may be based on an officer's "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). These stops, also known as *Terry* stops, require "reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d

8

479, 485 (5th Cir. 2002) (citing *Terry v. Ohio,* 392 U.S. 1, 21 (1968)).  "Reasonable suspicion" is "considerably easier for the Government to establish than probable cause." *United States v. Tellez,* 11 F.3d 530, 532 (5th Cir. 1993), *cert. denied,* 511 U.S. 1060 (1994) (citing *United States v. Wangler,* 987 F.2d 228, 230 (5th Cir. 1993)).  Still, a stop "must be carefully tailored to its underlying justification," which requires a fact-specific inquiry. *Emesowum*, 756 F. App'x at 378–79 (quoting *Fla. v. Royer*, 460 U.S. 491, 500 (1983)).  "This much . . . is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Emesowum*, 756 F. App'x at 379 (quoting *Royer*, 460 U.S. at 500).  The court examines "whether the officer's action was justified at its inception"— whether there was reasonable suspicion at the outset—and whether the stop "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20; *see Sokolow,* 490 U.S. at 9–10.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop[, and] . . . the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Fla. v. Royer*, 460 U.S. at 500.

The allegations describe a lawful investigatory stop.  Officer Mabes was reasonably responding to the need to separate Martinez from Capello in order to safely control Capello, who was increasingly erratic and to determine whether both men were intoxicated, or only one. Officer Mabes had a "reasonable, articulable suspicion" that Martinez may have been on drugs or involved in an altercation with the other person at the scene. *Chavez,* 281 F.3d at 485.  The initial stop did not last "longer than [was] necessary," as Martinez only stood by the car for 33 seconds. *Emesowum,* 756 F. App'x at 379. The allegations describe Martinez reasonably yielding to Officer

Mabes's initial assertion of authority in a brief investigatory stop.  *See Johnson*, 414 S.W.3d at 193.  Mabes's initial investigatory stop was not unconstitutional.

### 2.    The Escalation: Officer Mabes Grabs and Pushes Martinez

The plaintiffs allege that Martinez stood near the front of Officer Mabes's patrol car, in compliance with Mabes's requests, and showed no aggression.  (Docket Entry No. 25 at ¶ 21).  After less than a minute Officer Mabes, unprovoked, "reached forward and grabbed Martinez's right arm and pushed him against the car."  (*Id.* at ¶ 22; Paz body cam at 6:57:46 to 6:58:19).  The video recordings provided by the defendants does not contradict the plaintiffs' allegations.  The video recordings do not include Mabes's body camera footage.  The available video is taken at a distance that makes what Mabes and Martinez were saying inaudible.  (Paz body cam at 6:57:46 to 6:58:19).  The defendants assert that Officer Mabes was attempting to "establish control" over a resistant Martinez, necessitating Mabes's use of force.  (Docket Entry No. 27 ¶ 10).  But the court is bound to take the plaintiffs' well-pleaded allegations as true to the extent that they are not "blatantly contradicted" by record evidence.  *Ramirez,* 716 F.3d at 374.  The video footage shows Mabes and Martinez involved in a conversation and an apparently sudden escalation when Mabes abruptly turns Martinez around and pushes him against the car.

During an investigatory detention, "officers are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop.'"  *United States v. Thomas*, No. 20-10757, 2021 WL 1957412 (5th Cir. May 17, 2021) (alteration in original) (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  A seizure or arrest "occurs when, 'in view of the all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'"  *Lincoln v. Turner*, 874

10

F.3d 833, 841 (5th Cir. 2017) (internal citations omitted).  This determination "is a fact-specific inquiry." *Id.* (citing *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir. 2007) (An arrest occurred when police handcuffed a woman's hands behind her back and placed her in a police car for 30 to 45 minutes)).  The use of handcuffs alone does not turn a stop into an arrest.  *United States v. Estrada*, 459 F.3d 627, 634 (5th Cir. 2006) (citing *United States v. Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ("[T]he use of handcuffs, if reasonably necessary, while substantially aggravating the intrusiveness of an investigatory stop, does not necessarily convert a *Terry* stop into an arrest necessitating probable cause.")).

"In order to make a lawful arrest, an officer must have probable cause to believe the suspect committed a crime." *Ramirez*, 716 F.3d at 375 (citing *Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004)).  "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Flores*, 381 F.3d at 402 (internal quotation marks omitted).  "If an officer reasonably but mistakenly believes that probable cause exists, he is entitled to qualified immunity." *Ramirez*, 716 F.3d at 375 (citing *Club Retro, LLC v. Hilton*, 568 F.3d 181, 206 (5th Cir. 2009)).

The defendants appear to concede that Officer Mabes lacked probable cause to arrest Martinez and did not reasonably suspect that Martinez had a weapon or was otherwise dangerous at the time that Mabes grabbed his arm and pushed him against the car.  Instead, the defendants argue that Mabes was properly engaged in a "community caretaker" function when he detained Martinez and pushed him against the car.  (*See* Docket Entry No. 27 at 7–8).  The Fifth Circuit has not explicitly adopted a community-caretaker exception to otherwise unlawful seizures. *Keller v.*

11

*Fleming*, 952 F.3d 216, 223 n.16 (5th Cir. 2020).  The allegations, taken as true, plausibly allege that Mabes unreasonably seized Martinez when he grabbed him and forcibly pushed him against the car.  (*See* Paz body cam at  2:36).  Martinez yielded to Mabes's authority when his arm was grabbed and he was pushed against the patrol car.  This was conduct that a reasonable person would believe placed the person in custody.  *See Lincoln*, 874 F.3d at 841.

The plaintiffs allege, and the video does not contradict the allegations, that Martinez showed no signs of intoxication and made no antagonistic movements or statements that would prompt "a reasonable person to conclude that the [he] had committed or was committing an offense."  *Flores*, 381 F.3d at 402.  The plaintiffs allege, and the video does not contradict, that Martinez had complied with instructions before the seizure and posed no threat.  Martinez did not begin to resist until after Officer Mabes, apparently without provocation, grabbed Martinez's right arm and pushed him into the car, holding him in a way that made it clear he could not leave.  *See* TEX. PEN. CODE ANN. § 9.31(c) ("The use of force to resist an arrest or search is justified . . . if, before the actor offers any resistance, the peace officer . . .uses or attempts to use greater force than necessary to make the arrest or search.").  The well-pleaded allegations, taken as true, show that Officer Mabes's actions were not justified by a need to maintain officer safety or the status quo.

At this stage of the case, factual disputes preclude dismissing the claim against Officer Mabes on the basis of qualified immunity.  In a similar case, the Fifth Circuit held that an officer's decision to detain a man who was filming a police station in the back of a police car was "disproportionate to any potential threat that [the man] posed or to the investigative needs of the

officers," and violated clearly established law.  *Turner v. Lieutenant Driver*, 848 F.3d 678, 693

(5th Cir. 2017).  The court explained:

> Based on the allegations of [the] amended complaint, the officers lacked probable cause to arrest him . . . [he] "did not make any threats" against the officers, "did not [attempt] to leave or flee," and "did not take any aggressive actions."  The only potential reason the officers gave [the man] for arresting him that can be gleaned from the amended complaint is [his] failure to identify himself . . . None of the defendants contends that any of them had probable cause to arrest [the man] or that an arrest would have been objectively reasonable in light of clearly established law . . . [N]o objectively reasonable person . . . could have believed that there was probable cause to arrest [him].

*Id.* at 694–95; *see also Brooks v. City of W. Point, Miss.*, 639 F. App'x. 986, 989 (5th Cir. 2016)

("But viewing the facts at the time of arrest in the light most favorable to Brooks, no reasonable

officer could have believed that he could arrest Brooks solely because of the words he used. . .

which [did not constitute] 'fighting words.'").

The plaintiffs plausibly allege facts similar to the facts alleged in *Turner*.  When the officers

arrived on the scene Martinez was trying to calm his agitated companion and initially cooperated

with the officers.  (Docket Entry No. 25 at ¶¶ 17-19).  The body camera footage of the initial

encounter does not contradict the plaintiffs' allegations that Martinez showed no signs of

intoxication, aggressive behavior, or resistance.  Martinez complied with Officer Mabes's initial

commands to stand by his squad car.   The plaintiffs' plausible allegations, if proven, could show

that Mabes violated Martinez's clearly established Fourth Amendment right to be free from

unreasonable seizure.  *See Turner*, 848 F.3d at 694–95.  The parties sharply dispute facts material

to determining the reasonableness of the stop and therefore to qualified immunity.  Dismissal on

the basis of qualified immunity is inappropriate at this stage of the case.  The court may revisit

qualified immunity on a fuller factual record.

### 3.     The Continued Attempts to Detain Martinez

The complaint alleges that after Officer Mabes pushed Martinez against the car, Officer Cruz approached, and Mabes yelled at Martinez to "stop moving." (Docket Entry No. 25 at ¶ 22). Officers Cruz and Mabes then forcibly turned Martinez over and pushed him face forward into the car. (*Id.* at ¶ 23). The audio on Officer Paz's body camera records either Mabes or Cruz yelling "stop moving." (Paz body cam at 6:58:30). Officer Paz asks Mara Capello what was "wrong with" Guido Capello and Martinez, and she replies, "he's on drugs," referring to Guido Capello, then clarifying "I don't know about his friend." (*Id.* at 6:5835 to 6:58:38). Paz points at Martinez and asks, "that's his friend?" and Mara Capello replies "yes." (*Id.* at 6:58:39 to 6:58:43). Paz then approaches Martinez, Mapes, and Cruz. (*Id.* at 6:58:45). Only as Paz gets close to the patrol car is the struggle between Martinez, Mapes, and Cruz apparent on the video recording. (*Id.* at 6:58:48). The plaintiffs allege that, at this point, Officers Paz, Cruz, and Mabes still had "no reason to believe [Martinez] presented a threat to anyone." (Docket Entry No. 25 at ¶ 23). The video, showing both Mara Capello stating that Martinez may be on drugs and the ongoing struggle between Martinez, Mabes, and Cruz blatantly contradicts the plaintiffs' allegation that the officers had "no reason" to believe that Martinez, who was physically resisting the officers, was a threat. "In Texas, the act of resisting can supply probable cause for the arrest itself." *Ramirez*, 716 F.3d at 376 (The plaintiff resisted arrest when he pulled from the officer's grasp, giving the officer probable cause to arrest him).[2]

---

[2] *See also id.* ("The great weight of Texas authority indicates that pulling out of an officer's grasp is sufficient to constitute resisting arrest."); *Carroll v. Ellington*, 800 F.3d 154, 172 (5th Cir. 2015) ("Viruette's belief there was probable cause to arrest Barnes when Barnes pulled away from his attempt to prevent entry into the dwelling was also not objectively unreasonable in light of clearly established law."); *Ayala v. Aransas County*, 777 Fed. Appx. 100, 106 (5th Cir. 2019); *Osborne v. Harris County, Tex*., 97 F. Supp. 3d 911, 935 (S.D. Tex. 2015).

The other officers did not unlawfully seize Martinez; they became involved in the situation only after Martinez resisted arrest by Mabes.  When Officers Paz and Cruz, and later Smith, assisted in the struggle to take Martinez into custody, they did so with probable cause.  Martinez pulled away from Officer Mabes's and Cruz's attempts to put him in handcuffs and ignored orders to get on the ground and to stop moving.  Officers Paz, Cruz, and Smith are, at a minimum, "entitled to qualified immunity on the detention claim because a reasonable officer could have believed that he had probable cause to arrest [Martinez]." *Osborne*, 97 F. Supp. 3d at 935.  The unlawful detention claims against Officers Paz, Cruz, and Smith are dismissed without prejudice.

The complaint does not specifically allege that Officers Lockmondy, Hardin, Wright, Bennett, or Dever unlawfully detained or arrested Martinez, but it does allege that they were present during the struggle to subdue Martinez or arrived in its aftermath.  The unlawful detention claims against Officers Lockmondy, Hardin, Wright, Bennett, and Dever are dismissed, without prejudice, for the reasons set out above.  The claim against Officer Mabes proceeds.

### B.    Excessive Force

The plaintiffs allege that the officers used force that was clearly excessive to the need to subdue Martinez.  (Docket Entry No. 25 at ¶ 62).  The officers argue that the plaintiffs have failed to allege plausible facts that could show that the officers used excessive force because the video recordings show that officers used "measured and ascending" force that "corresponded to Martinez Jr's escalating verbal and physical resistance."  (Docket Entry No. 27 at ¶ 20; *see also* Docket Entry No. 34 at 10 (same); Docket Entry No. 45 at ¶ 16 (same)).  The officers argue in the alternative that the plaintiffs' allegations are not sufficient to overcome the officers' qualified

immunity.  (Docket Entry No. 27 at 10-11; Docket Entry No. 34 at 13; Docket Entry No. 45 at 9–11).

A plaintiff asserting an excessive-force claim under § 1983 must allege facts showing he suffered "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable."  *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) (citing *Flores*, 381 F.3d at 396).  "In assessing a claim of excessive force, courts ask 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.'"  *Lombardo v. City of St. Louis, Missouri*, 141 S. Ct. 2239, 2241 (2021) (per curiam) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Factors such as "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting," as well as other relevant circumstances "may bear on the reasonableness or unreasonableness of the force used."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

While it is clearly established that arrestees have a "constitutional right to be free from excessive force during an investigatory stop or arrest," this does not end the qualified immunity inquiry.  *Shumpert v. City of Tupelo*, 905 F.3d 310, 321 (5th Cir. 2018), *as revised* (Sept. 25, 2018).  "To defeat qualified immunity, a plaintiff must demonstrate that it would be clear to a reasonable

officer that his conduct was unlawful in the situation he confronted." *Id.* (internal quotation marks omitted).

The complaint alleges that:

- Officer Mabes "without any justification . . . grabbed Martinez's right arm and pushed him against the car," struck Martinez with his fists and kicked him.  (Docket Entry No. 25 ¶¶ 22, 42).

- Officer Cruz pushed Martinez against the side of the squad car,  deployed his taser on Martinez twice while he was on the ground, and kicked and struck Martinez "at least once." (*Id.* at ¶¶ 23, 26, 27 40).

- Officer Smith placed Martinez in a painful wrist lock, grabbed Martinez and threw him to the ground, causing Martinez to strike his head multiple times, struck Martinez with his fists, placed his knee on Martinez's neck multiple times, struck Martinez in the chest with his knee, and kicked Martinez in the arm and stomach.  (*Id.* at ¶¶ 25, 27, 30, 43).

- Officer Paz sprayed Martinez in the face with pepper spray, pushed Martinez's head into the ground by applying pressure to his neck with both hands, hit Martinez with his hands and knees, and kicked him.  (*Id.* at ¶¶ 30, 41).

- Officer Bennett struck Martinez with his fists and knee and applied "mandibular angle pressure" with his thumb behind Martinez's ear.  (*Id.* at ¶ 38).

- Officer Dever hit and kicked Martinez, pushed him into the ground, and "intentionally dropped an incapacitated, handcuffed [Martinez] to the ground after lifting him up." (*Id.* at ¶ 39).

The complaint does not allege that Officers Lockmondy, Wright, or Hardin used force against Martinez.   The excessive-force claims against Officers Lockmondy, Wright, and Hardin are dismissed, with prejudice, because the allegations and record show no basis for further attempts to amend.

The complaint does not allege that Officer Mabes's initial use of force—grabbing Martinez's arm and pushing him against the car—caused him injury.  (*See* Docket Entry No. 38 at 6 ("Martinez was beaten, electrocuted, gassed and thrown to the ground, which directly and proximately caused him pain, injury, seizures and, tragically, his death.")).  The plaintiffs have not stated a claim for excessive force based on Officer Mabes's initial action to detain Martinez.

The plaintiffs allege that Officers Mabes, Cruz, Smith, Paz, Bennett, and Dever used force that escalated to excessive even if it did not begin there.  The plaintiffs allege that the escalating force wantonly inflicted pain, made Martinez "disoriented and unable to communicate," triggered at least one seizure, and caused his death about 20 hours later.  (Docket Entry No. 25 at ¶¶ 25, 31, 34, 36).  The medical examiner who examined Martinez's body determined that his death was a homicide.  (*Id.* at ¶ 37).  The plaintiffs provided a photograph of Martinez in the hospital showing his facial injuries and the need for a ventilator to allow him to breathe:



Officers Mabes, Cruz, Smith, Paz, Bennett, and Dever do not dispute that their use of force injured Martinez, nor do they dispute that the force resulted in his death.  The issue is whether the officers' repeated and escalating use of force to counter Martinez's resistance and efforts to flee was objectively reasonable.  The court considers each relevant factor below.

### 1.    The Severity of the Crime

The plaintiffs' allegations indicate, and the video recordings show that the officers may have reasonably believed, that Martinez had taken illegal drugs.  (Paz body cam at 6:5835 to 6:58:38 (Mara Capello states "he's on drugs," referring to Guido Capello, then clarifies that "I don't know about his friend.")).  Public intoxication is a Class C misdemeanor in Texas, making it  "a minor offense militating against the use of force."  *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (citing Tex. Penal Code § 49.02(c)).

### 2.    The Immediate Threat to the Officers

The plaintiffs allege that at no point during the encounter did the officers have reason to believe Martinez presented an imminent threat of harm to the officers.  (Docket Entry No. 25 at ¶¶

22, 23, 25, 26, 27, 28, 29, 30, 32, 33).   The video recordings the officers submitted do not show Martinez verbally or physically threatening the officers.   They do show him refusing to comply with or struggling to resist the officers' commands, resisting efforts to make him comply, and then trying to flee.   Resistance to arrest, without more, may not be enough to show an immediate threat to the officers' safety.   *Compare Ramirez*, 716 F.3d at 378 ("Pulling [an] arm out of [an officer's] grasp, without more, is insufficient to find an immediate threat to the safety of the officers."), *with Saucier v. Katz*, 533 U.S. 194, 205 (2001) ("If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.").   Taking the plaintiffs' uncontradicted allegations as true for the purposes of these motions, Martinez did not pose an immediate threat to officers, militating against the use of force.

### 3.      Resisting Arrest

"Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." *Orr v. Copeland,* 844 F.3d 484, 492–93 (5th Cir. 2016) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).   "When dealing with an uncooperative suspect, police act within the scope of objective reasonableness when they react with measured and ascending responses."   *Id.* (internal quotation marks and brackets omitted).

The plaintiffs allege that throughout the struggle, the officers' conflicting commands and the fact that multiple officers involved tried to restrain Martinez by pushing and pulling him in different directions made it more difficult for Martinez to comply with their instructions.   The plaintiffs nonetheless acknowledge that Martinez "continued to move" in spite of the officers'

clear commands to stop, stood up after he was tasered the first time, and moved away from the officers.  (Docket Entry No. 25 at ¶¶ 26, 27, 28).

Officer Paz's body camera recording confirms that Martinez did not comply with the officers' repeated commands.  The video does not show the entire struggle.  When Martinez is visible, the video shows him resisting being put in handcuffs, struggling to evade and resist the officers, and attempting to flee by walking, then running, away from the officers.  (*See* Paz body cam at 6:58:48 to 7:03:38).  The video shows that the officers issued repeated warnings before tasing Martinez the first time.  (*Id.* at 6:59:15 to 6:59:43).  The video shows that Martinez continued to refuse officers' orders and attempts to place him in handcuffs in the few seconds before Officer Paz directed Officer Cruz to "tase him bro."  (*Id.* at 7:00:00 to 7:00:21).  Paz shortly thereafter tells Cruz to "do it again, bro," referring to the taser.  (*Id.* at 7:00:26).  Officer Bennett's body camera video shows that Martinez stood up after he was first tasered and fell to the ground when Cruz tasered him a second time.  (Bennett body cam at 7:00:12 to 7:00:21).  Bennett's body camera video then shows Martinez walking away from the officers after the second taser, despite their repeated commands to "stop."  (*Id.* at 7:00:34 to 7:00:45).  Bennett's body camera clearly shows Officer Paz commanding Martinez to "stop," and then spraying Martinez in the face with pepper spray as Martinez continued to walk away.  (*Id.* at 7:00:45 to 7:00:47).  The video then shows Martinez running away while three officers, including Officer Bennett gave chase, tackled him, and brought him to the ground.  (*Id.* at 7:00:50 to 7:01:00).  The officers then succeeded in subduing Martinez and placing him in handcuffs and a leg "hobble."

The videos show that Martinez disregarded repeated clear commands to allow himself to be placed into handcuffs, to lie face down on the ground, and to stop moving away from the

officers.   The Fifth Circuit has found that officers responded with "measured and ascending actions" and that qualified immunity applied when, as here, the record showed that an arrestee "ignored multiple requests and warnings" and the officers deployed tasers "only after he continuously failed to comply."   *Pratt v. Harris Cty., Tex.*, 822 F.3d 174, 182 (5th Cir. 2016) (internal quotation marks omitted).   The plaintiffs' plausible allegations and the video recordings here dictate a similar finding in this case.

The plaintiffs have not plausibly alleged that Officers Mabes, Cruz, Smith, Paz, Bennett, or Dever violated clearly established law by using force during their struggle to subdue Martinez. The excessive-force claims against Officers Mabes, Cruz, Smith, Paz, and Bennett are dismissed without prejudice.

### 4.    Officer Dever's Actions Against the Handcuffed Martinez

The officers were ultimately able to subdue Martinez and place him in handcuffs and a leg hobble.   The plaintiffs allege, and the video confirms, that at that point Martinez was disoriented and in medical distress.   The plaintiffs allege that Officer Dever then used objectively unreasonable force when he pushed the handcuffed and "near unconscious" Martinez into a sitting position and then let him go and fall back to the ground.   (Docket Entry No. 25 at ¶ 33).

The video recordings do not contradict the plaintiffs' allegations.   One body camera video shows Officer Dever lifting Martinez up and then letting him to drop backwards so that his body and head slammed into the ground.   (Lockmondy body cam at 7:10:15 to 7:10:32).

"[W]hen an arrestee is not actively resisting arrest the degree of force an officer can employ is reduced."   *Darden*, 880 F.3d at 731; *see also Ramirez*, 716 F.3d at 378 ("[W]e have held the use of certain force after an arrestee has been restrained and handcuffed is excessive and

unreasonable."). Well-pleaded factual allegations that an officer slammed an arrestee's head into a car after he was handcuffed and subdued state a claim for objectively unreasonable force violating clearly established law. *Bush*, 513 F.3d at 502. When Officer Dever lifted Martinez up to a sitting position and dropped him backwards onto the ground, Martinez was in restraints and not resisting. The complaint's plausible allegations, if proven, could also show that the impact of Martinez's head on the ground contributed to his death. The complaint alleges that Martinez had "at least one seizure" in the moments after Officer Dever dropped him back onto the ground, and "never regained his mobility or mentation again." (Docket Entry No. 25 ¶ 34). The plaintiffs have plausibly alleged facts that could show, if proven, that Officer Dever's use of force violated clearly established law.

### C.    Civil Conspiracy

Civil conspiracy under § 1983 imposes liability for a constitutional violation on the defendants "without regard to the person doing the particular act" when a plaintiff "present[s] evidence that the defendants acted jointly" and committed an overt act in furtherance of the conspiracy. *Latiolais v. Cravins*, 484 F. App'x 983, 988-89 (5th Cir. 2012) (quoting *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir 1995); *see also Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 ("[A] conspiracy claim is not actionable without an action violation of section 1983."). For a plaintiff to state a claim for civil conspiracy under § 1983, a plaintiff must allege both a conspiracy involving state action and a "deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019) (citing *Pfannstiel*, 918 F.2d at 1187).

23

The plaintiffs allege that the officers conspired to violate Martinez's constitutional rights by detaining and arresting him, by agreeing "to hold [Martinez] on the ground" so that they could use excessive force against him, and by falsifying documents to cover up their constitutional violations.  (Docket Entry No. 25 at ¶ 72).

To proceed with a civil conspiracy claim, the court must first identify a well-pleaded claim of a violation of clearly established federal law.  *See Pfannstiel*, 918 F.2d at 1187.  The plaintiffs have plausibly alleged that Officer Mabes violated Martinez's clearly established right to be free from unlawful seizure by initially restraining Martinez.  They have also plausibly alleged that Officer Dever violated Martinez's clearly established right to be free from excessive force when he dropped the handcuffed and unresisting Martinez backwards onto the ground.  But the plaintiffs have not alleged the necessary "operative facts" to show that these or other officers participated in a conspiracy to commit these constitutional violations.  *See Jackson v. City of Hearne, Texas*, 959 F.3d 194, 206 n.16 (5th Cir. 2020).  The complaint alleges only that each of the defendant officers was on the scene and took part in efforts to subdue Martinez or arrived afterwards.  The speculative assertion that the officers conspired to violate Martinez's constitutional rights is not sufficient to state a claim for civil conspiracy.

Nor does the allegation that the officers prepared only one report, without more, show a civil conspiracy.  The complaint does not allege that preparing only one report is unusual or other facts that could show that the existence of only one report supports the inference of a civil conspiracy.

The civil conspiracy claims are dismissed, with prejudice, because further amendment would be futile.

### D.    Deliberate Indifference and Denial of Medical Care

"Prison officials violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs constituting an unnecessary and wanton infliction of pain." *Brewster v. Dretke*, 587 F.3d 764, 769–70 (5th Cir.2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Just.,* 239 F.3d 752, 756 (5th Cir. 2001). A prison official shows deliberate indifference if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The "failure to alleviate a significant risk that [the] official should have perceived but did not" is insufficient to allege deliberate indifference. *Id.* at 838. A plaintiff must allege that prison officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

"As a pretrial detainee, [Martinez's] constitutional rights flowed from the due process guarantees of the Fourteenth Amendment rather than from the Eighth Amendment's prohibition against cruel and unusual punishment*." Garcia v. City of El Paso*, 79 F. App'x 667, 669 (5th Cir. 2003) (citing *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). Nevertheless, "[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody [are] analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581

25

F.3d 63, 72 (2d Cir. 2009); *see also Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001) ("[T]here is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care . . . When the alleged unconstitutional conduct involves an episodic act or omission, the question is whether the state official acted with deliberate indifference to the inmate's constitutional rights, regardless of whether the individual is a pretrial detainee or state inmate.").

The plaintiffs allege that Martinez was under the custody and control of the officers who, after they used the force that put him in handcuffs and on the ground, knew that he "was at serious risk to his physical health and welfare." (Docket Entry No. 25 ¶¶ 77–78). The plaintiffs allege that the officers did not check Martinez's vitals, pressed Martinez into the ground, and took no action to help even when, after two taser applications and physical struggles, he was apparently insensible. (*Id.* ¶¶ 79–81). The plaintiffs acknowledge that the officers "called Emergency Medical Services to the scene" after subduing Martinez. (*Id.* ¶ 35).

One of the officers, Lonnie Smith, makes specific arguments for the dismissal of the deliberate indifference claim against him. (Docket Entry No. 34 at 11). The other officers generally argue that "[t]he allegations in Plaintiffs' amended complaint fail to state a claim for relief against any Defendant," (Docket Entry No. 27 at 1) and that "the factual allegations in Plaintiffs' complaint fail to state a plausible claim for relief against Officer Cruz." (Docket Entry No. 45 at 2). The plaintiffs make the same allegations as to all the defendant officers and had an opportunity to respond to the arguments Smith raises. The court applies Smith's arguments for dismissal, as relevant, to each defendant.

Officer Smith does not dispute that Martinez was in police custody as a pretrial detainee, but argues that the plaintiffs have not plausibly alleged that Smith was close enough to Martinez, after he was handcuffed and on the ground to "appreciate that he was at a substantial risk for serious harm (if he even was)." (Docket Entry No. 34 at 12). Smith argues that even if the plaintiffs plausibly allege that he was aware of the risk to Martinez, the plaintiffs have not shown that he ignored Martinez or refused to treat him because the complaint and the videos show that the officers promptly called Emergency Medical Services to help Martinez. (*Id.*).

The plaintiffs plausibly allege that all the officers present were aware of the serious risk of harm to Martinez after the struggle ended with him lying on the ground in handcuffs. The complaint alleges that Officers Smith, Mabes, Paz, Lockmondy, Hardin, Wright, Bennett, Cruz, Dever each participated in the violent struggle to subdue Martinez or were present for its aftermath. The complaint alleges that "Martinez's behavior and condition had drastically changed since the initial contact due to the beating he had received from the officers," and that he was clearly distressed, "disoriented," and "unable to communicate" after the violent encounter. (Docket Entry No. 25 at ¶ 31).

The video recording after he was handcuffed does not contradict these allegations. The recording shows that Martinez was in obvious distress and repeatedly asking for water. (*See* Lockmondy body cam at 7:06:10, 7:08:10, 7:08:16, 7:09:55 (Martinez asks for water); Paz body cam at 7:07:07 to 7:07:30 (Martinez appears unable to stand and makes incoherent statements such as "stop being so loud" and "I'm trying to go to sleep."). Officer Paz's body camera recording shows that after Martinez was subdued Paz questioned Mara Capello about whether Martinez was on drugs "so that if EMS gets here we can know." (Paz body cam at 7:07:22 to 7:07:35). Officer

27

Lockmondy's body camera recording shows the officers discussing the force they used against Martinez and his injuries.  (Lockmondy body cam at 7:12:00 to 7:12:40).  The complaint alleges, and the video confirms, that the officers were nearby, in communication with other officers, and aware that Martinez was in medical distress.  The officers responded to Martinez's distress by calling Emergency Medical Services.

The allegations that the officers acted callously in the face of Martinez's obvious medical distress while they were waiting for the ambulance to arrive are not sufficient to state a claim for deliberate indifference to medical needs.   The officers called Emergency Medical Services. Officer Lockmondy's body camera recording shows that Emergency Medical Services arrived at about 7:10 a.m., approximately 10 minutes after the officers handcuffed Martinez and a few minutes after he had a seizure.  (*Id.* at 7:10:00).  Officer Paz sought information to provide to Emergency Medical Services so that they could treat Martinez.  The complaint does not plausibly allege that the officers "refused to treat [Martinez], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson,* 759 F.2d at 1238.  The allegation that the officers failed to give Martinez water to drink or wash the pepper spray off of his face in the few minutes before EMS arrived is not sufficient to state a claim for deliberative indifference.  This claim is dismissed with prejudice because further amendment would be futile.

## III.   The Claims Against the City and School District

"To establish [a] municipal liability [claim] under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Whitley v. Hanna*, 726 F.3d 631, 649 (5th Cir. 2013) (quoting

*Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)).   "The[se] three attribution principles . . . are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *see also Fraire v. City of Arlington*, 957 F.2d 1268, 1277 (5th Cir. 1992) ("[M]unicipalities may be liable for damages under § 1983, but only when an official policy or governmental custom of the municipality causes the deprivation or violation of the constitutional rights complained of by the plaintiff.").

### 1.    Official Policy or Custom

"[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *see also Hicks-Fields v. Harris Cty.*, 860 F.3d 803, 811 (5th Cir. 2017) (quoting *Peterson*, 588 F.3d at 852) ("To hold that this evidence is sufficient to establish an official policy of Harris County 'would be effectively to hold the [County] liable on the theory of respondeat superior, which is expressly prohibited by *Monell*.'").   Policy can "arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Peterson*, 588 F.3d at 847 (quoting *Piotrowski*, 237 F.3d at 579).   "There is no 'de facto' final policymaking authority." *Id.*   "[A] complaint need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." *Peña v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (quoting *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016)).

The plaintiffs must plead facts that link the alleged civil rights violation to the policymaker's acts or omissions that are "so persistent and widespread as to practically have the force of law." *Id.* at 621–22 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)).

### 2.      Municipal Policymaker

The plaintiffs must allege not only facts supporting the existence of an unconstitutional policy, practice, or custom, but also facts that could show "'[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Id.* at 623 (alteration in original) (quoting *Hicks-Fields*, 860 F.3d at 808). An alleged "deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation[.]" *Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 406 (1997). "A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411.

### 3.      Moving Force

The third municipal liability prong requires the plaintiffs to "establish that the policy was the moving force behind the violation" and to "show direct causation." *Peterson*, 588 F.3d at 848; *see also Monell*, 436 U.S. at 694. "[T]here must be a direct causal link between the municipal policy and the constitutional deprivation." *Piotrowski*, 237 F.3d at 580. "This connection must be more than a mere 'but for' coupling between cause and effect. To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the moving force behind it." *Fraire*, 957 F.2d at 1281 (footnotes omitted). The standard for causation is high, because "where a court fails to adhere to rigorous requirements of culpability

and causation, municipal liability collapses into respondeat superior liability." *Piotrowski*, 237 F.3d at 580 (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

The plaintiffs have not stated a claim against the individual Pasadena Independent School District defendant, Officer Lonnie Smith.  The municipal liability claims against the school district are also dismissed, with prejudice because further amendment would be futile.

This court previously dismissed the plaintiffs' municipal liability claims against the City of Pasadena, finding that the plaintiffs had not plausibly alleged a municipal policy, policymaker culpability, or a causal connection between a policy and the constitutional violation.  (Docket Entry No. 22 at 12–15).  In their amended complaint, the plaintiffs add the following allegations about the Pasadena Police Department to support their contention that the constitutional violations resulted from a municipal policy:

- In 2007, Pedro Gonzales was beaten to death by Pasadena Police Department officers using knee strikes, elbow strikes, and fists. No Pasadena Police Department officer was punished.

- In 2012, Jose Sauceda, Jr., was beaten and hogtied by Pasadena Police Department officers. He died on the way to the hospital.  No Pasadena Police Department officer was punished.

(Docket Entry No. 25 at ¶ 57).

The plaintiffs plausibly allege that Officer Mabes violated Martinez's clearly established right to be free from unlawful detention by grabbing Martinez's arm and pushed him against the patrol car.  They also plausibly allege that Dever violated Martinez's clearly established right to be free from excessive force when he dropped the then-handcuffed and unresisting Martinez

31

backwards onto the ground.  But the two prior incidents the plaintiffs cite in their amended complaint are not enough to support an inference of either a widespread practice of Pasadena Police Department constitutional violations like those the plaintiffs plausibly allege or that a municipal policymaker had actual or constructive knowledge of an unconstitutional policy or practice.

The municipal liability claims against the City of Pasadena are dismissed with prejudice because further leave to amend would be futile.

## IV.    Conclusion

The motion to dismiss filed by the Pasadena Independent School District and Lonnie Smith, II, (Docket Entry No. 34), is granted.  The motion to dismiss filed by Federico Cruz, Jr., (Docket Entry No. 45), is granted.  The City of Pasadena's and the remaining officer defendants' motion to dismiss, (Docket Entry No. 27), is granted in part and denied in part.

All claims against the City of Pasadena, Pasadena Independent School District are dismissed with prejudice.  All claims against officers Lonnie Smith II, Federico Cruz, Jesus Paz, Joseph Lockmondy, Mark Hardin, Donna Wright, and Paul Bennett are dismissed.  The deliberate-indifference and civil-conspiracy claims are dismissed, with prejudice, as to all defendants.  The false-arrest claims against Cruz, Paz, Lockmondy, Hardin, Wright, Bennett, Smith, and Dever are dismissed without prejudice.  The excessive-force claims against Lockmondy, Wright, and Hardin are dismissed with prejudice.  The excessive-force claims against Mabes, Cruz, Smith, Paz, and Bennett are dismissed without prejudice.

The unlawful-arrest claim against Mabes and the excessive-force claim against Dever proceed.  These claims proceed because there are factual disputes material to determining the

objective reasonableness of the force these officers used and therefore of whether they are entitled to qualified immunity.

Counsel for the remaining parties must appear, by Zoom, for a scheduling conference on **September 10, 2021 at 11:30 a.m.** CDT.  A Zoom link will be separately sent.

SIGNED on August 16, 2021, at Houston, Texas.

_____

Lee H. Rosenthal
Chief United States District Judge